# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

United States of America ex rel.
JEFFERY CAMPBELL,

      Plaintiff,

      v.

MARCUS HARDY, Warden,

      Defendant.

No. 10 C 2871
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Jeffrey Campbell seeks a writ of habeas corpus. He is serving a long sentence in state prison. The basic facts of the case are set out in the opinion of the Appellate Court affirming his conviction and sentence on appeal. I quote from the Order.

On December 25, 2000, Harold McKinney was shot and killed near the intersection of 115th Street and Perry Avenue in Chicago, Illinois.

On December 28, Detective Dan Stover…displayed a photo array of [Campbell] and four other men to witnesses Natasha Mebane and J.D. Watkins, who both identified [Campbell] from the array. as the shooter. On January 4, 2001, [Campbell] was arrested and was positively identified in a lineup by Mebane and Watkins the next day. However, witness Dominique Williams could not identify anyone in the lineup. [Campbell] was subsequently charged with nine counts of first degree murder, one count of attempted murder, and one count of aggravated discharge of a firearm.

[Campbell sought, prior to trial, to exclude] evidence that he was

associated or affiliated with a street gang, evidence that he carried a weapon, evidence that he had consumed alcohol, or evidence of any prior convictions. The court reserved ruling on all issues except gang evidence, and ruled that gang evidence was admissible because it was relevant to motive and [to the description of] the events prior to the shooting.

Jury trial began October 21, 2003. The evidence presented at trial disclosed that around 7:45 p.m. on December 25, 2000, Mckinney, Mebane, Watkins and Willianx left Watkin's sister's house for the purpose of driving Mebane to meet some friends at the corner of 115th and Wentworth Avenue. McKinney drove his sister's white Buick Skylark, Watkins sat in the front passenger seat, Mebane sat behind Watkins, and Williams sat behind McKinney. It took two or three minutes to drive from Watkins' sister's home to ll5th and Wentworth. When they were three car lengths from. the corner of ll5th and Wentworth, Mebane exited the car and walked a few feet to the corner to meet her ride. When she reached the corner, she saw a man walking east on ll5th, yelling obscenities and carrying a gun, whom she later identified in court as [Campbell]. Mebane ran back to the car and told McKinney to turn left on ll5th, but McKinney turned right in the direction of defendant. McKinney stopped at the corner of ll5th and Perry and turned around in the parking lot of a liquor store on Perry. From there, Watkins could see [Campbell] talking to another individual and "throwing down gang signs." The other man left and McKinney pulled his car over to the corner of ll5th and Perry where defendant stood.

[Campbell] approached the vehicle on the passenger side and looked into

Watkins' window. [Campbell] flashed a gang sign by making a pitchfork with his hand, and had his gun out. McKinney, Watkins, Mebane, and Williams shook their heads to indicate they did not want trouble. Defendant walked around the car, bent over, looked into McKinney's window, stood back up, and shot McKinney from approximately an inch away from the window.

McKinney, having been shot, tried to drive north toward State Street. However, McKinney blacked out, Watkins grabbed the steering wheel, and the car crashed into a snow bank at 32 West ll5th Street. After the crash, Mebane and Williams exited the vehicle and ran to State Street. A woman picked up the two girls and drove them to their cousin's house. Watkins, meanwhile, had gone around to the driver's side of the vehicle to check on McKinney. At that point he saw the same man with a gun standing near a gate. [In court he later identified the man as Campbell'] [Campbell] fired two shots at Watkins and then fled on foot. Watkins ran away from the car and down an ally to McKinney's mother's house.

There was some discrepancy in the testimony concerning [Campbell's] whereabouts on December 25, 2000. [Campbell's] mother, girlfriend, and brother all testified that he had been with them until sometime between 7:30 p.m. and 8:.00 p.m. at defendant's mother's house. However, Detective Stover testified that statements defendant made during his interrogation indicated he was at his friend Calvin Short's house all day, drinking with Short· and another friend, Steven Lige. Stover also testified that, in a subsequent interrogation, defendant admitted to being near the scene of the shooting later that night, although he could not remember why he was there.

The State introduced evidence of defendant's gang membership and gang signs. Watkins also testified that defendant had flashed a gang sign that represented the Gangster Disciples and demonstrated this sign to the jury. Watkins further stated that, although he was a member of the Black P Stone gang at the time of trial, he was not a gang member on December 25, 2000. He also testified that McKinney, Mebane, and Williams were not gang members at the time of the incident, and that Mebane and Williams were currently not members of any gang.

Jeanine Griffin, [Campbell's] girlfriend, next testified that [Campbell] was a member of the Black Disciples street gang. She demonstrated the gang sign of the Black Disciples for the jury. [Campbell's] brother also testified that defendant was a member of the Black Disciples.

[During closing argument the State referred to gang membership twice] First, the State argued that it established motive because "the victims [didn't] give the response the defendant would [have] like[d] to the gang signs [he threw] at them." Secondly, the State argued that the gang evidence testimony showed that the witnesses had ample opportunity to view [Campbell] prior to the shooting. In closing argument, defense argued that the gang sign flashed by the shooter was not representative of the gang in which [Campbell] was a member and, thus the killer could not be defendant.  In response to this remark, the State, in rebuttal, made the following statement: "Is the killer a BD [Black Disciple], GD [Gangster Disciple]? Who cares? This case is not about gangs. Was this man false flagging? Who cares?  Did he actually put up treys instead of a pitch fork? Who cares?

This case is about identification."

The jury found [Capmbell] guilty of the first degree murder of McKinney and attempted first degree murder of Watkins. The jury also specifically found that defendant, during the commission of the offerlse of first degree murder, personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to McKinney.

After [post trial motions were denied and] following a hearing, the trial court sentenced [Campbell] to 47 years' imprisonment: 22 years for first degree murder plus the mandatory 25-year· enhancement because defendant personally discharged a firearm causing death during the course of the offense. Defendant was also sentenced to six years imprisonment for attempted first degree murder, to run concurrently with his murder sentence. This appeal followed."

The Appellate Court ruled the admission of gang evidence was proper in this case. It rejected Campbell's claim that the 25 year sentencing enhancement was improper. It held:

Illinois courts recognize that "gangs are regarded with considerable disfavor." *People v. Gonzalez,* 142 Ill. 2d 481, 489, 568 N.E.2d 864 {1991). Despite this stigma, "gang-related evidence will not necessarily be excluded if it is otherwise relevant and admissible." *Gonzalez,* 142 Ill. 2d at 489. However, gang-related evidence is only admissible when there is sufficient proof that gang membership or affiliation is related to the crime charged. *People v. Smith,* 141 Ill. 2d 40, 58, 565 N.E.2d 900 (1990). Gang- related evidence is admissible if it tends to "show that the defendant acted with a common purpose or was part of a

common criminal design" or provides ·"a.. motive for an otherwise inexplicable act." *People v. Williams,* 324 Ill. App. 3d 419, 431, 753 N.E.2d 1089 (2001) Admission of evidence, including gang evidence, is within the trial court's discretion. *Williams, 324* Lll. App. 3d at 430. As such, we will not disturb the trial court's decision absent a clear abuse of discretion. *People v. Joya,* 319 Ill. App. 3d 370, 376, 744 N.E.2d 891 (2001).

Here, we agree with the State that gang-related evidence was relevant to establish identity and to provide motive for an otherwise inexplicable act. First, the testimony that the shooter flashed a gang sign at the witnesses was relevant for the purpose of establishing identity. Although testimony showed that defendant was not affiliated· with the Gangster Disciples, whose sign he flashed, testimony of the "false flagging" practice and animosity between defendant's gang (the Black Disciples) and the Gangster Disciples provided support for the State's contention that defendant was the shooter. Also, this testimony demonstrated that the witnesses had ample time to view the shooter, which adds credence to their identification of defendant. In *Gonzalez,* the court found that gang-evidence was "relevant as part of the narrative describing the events leading to the defendant's identification and arrest." The same is true· here. The gang evidence was part of the narrative of events that ultimately led to the identification of defendant.

Secondly, gang-related evidence was relevant because it provided a motive for defendant's otherwise inexplicable act. Although motive is not an essential element of murder and the State is not obliged to prove it in order to

sustain a murder conviction, any evidence which tends to show that an accused had a motive for killing the deceased is relevant because it enhances the probability that the accused did kill the deceased. *People v.* Carson, 238 Ill. App. 3d 457, 464, 606 N.E.2d 363 (1992). See also *Smith,* 141 Ill. 2d at 56. However, it is recognized "that while it is entirely proper for the State to prove a motive, it is not enough that the State merely produce evidence of motive in the abstract, *i.e.,* that someone may have had a motive at some time to kill the deceased…. Rather the motive must be attributable to the defendant on trial at the time the crime was committed…. Here, the fact that a gang sign was flashed immediately prior to the homicide could reasonably be interpreted as evidence that the shooting was gang related.

As for the State's comments during closing arguments, they were made in response to defendant's closing argument and followed earlier statements that mentioned the relevance of the evidence for the two reasons cited above. Because evidence of gang membership and signs was relevant to the events leading up to McKinney's murder and defendant's identification as the shooter, as well as to establish a motive for an otherwise inexplicable act, we find that the trial court did not abuse its discretion in admitting this evidence.

Defendant… contends that the 25-year-enhancement of sentence under the Unified Code of Corrections (Code) {730 ILCS 5/5-8-1{a}{d}{iii} {West 2002)) for murder based on personally discharging a firearm that causes severe injury or death is unconstitutional.

A. Due Process

Defendant first maintains that the 25-year-enhancement provision of the Code violates due process because it does not bear a reasonable relationship to the purpose of the statute since it punishes the potential harm that could result from the use of a firearm (25 years to life) more harshly than the actual harm, *i.e.,* a death (20 to 60 years).

In *People v. Thompson,* 354 Ill. App. 3d 579, 821 N.E.2d 664 (2004) the court held that "if the 25-year-to-natural-life sentence enhancement can be upheld with respect to the underlying offense of armed robbery with personal discharge of a firearm causing great bodily harm *[People v. Sawczenko-Dub,* 345 Ill. App. 3d 522, 803 N.E.2d 62 (2003)] and the underlying offense of attempted first degree murder *[Morgan,* 203 Ill. 2d 470], it can certainly be upheld with respect to the more serious offense of first degree murder." *Thompson,* 354 Ill.. App. 3d at 594. We find defendant's due process argument without merit.

B. Double Enhancement

Defendant next maintains that the trial court erred in imposing a 25-year-enhancement sentence upon him because only one person was harmed and the plain language of the statute requires injury to at least two individuals. Alternatively, defendant maintains that the enhancement provision violates double enhancement principles because it punishes for an element fnherent in the offense. The court in Thompson also addressed both of the arguments raised by defendant here and rejected them. With respect to the"another person" argument, the *Thompson* court found that "[t]he language of the sentence-enhancing provision is clear. *** There could be no question that this language, in

context, covers with a single sentence both the murder victims and all others, aside from the shooter, in the vicinity who were seriously injured or killed." *Thompson,* 354 Ill. App. 3d at 591. In other words, the *Thompson* court rejected the defendant's argument that the provision applies only when another injury or death, other than the murder victim, occurs. See also *People v. Tolbert,* 354 Ill. App. 3d 94, 100, 820 N.E.2d 6 (2004) (holding that "the victim of a murder qualifies as 'another person' for purposes of subsection (d) (iii)[of section 5-8-1(a)(1) of the Code][11] ).

With respect to the double enhancement argument,. the *Thompson* court concluded: "There is no double enhancement here. Firearm use is not inherent in the offense of first degree murder. [Citation.] It is when first degree murder is committed by discharging a firearm that the sentence is enhanced.[11] *Thompson,* 354 Ill. App. 3d at 592.

Although defendant argues that these courts have misconstrued the statute by concluding it was the use of the firearm that triggered the enhancement, not the death itself, we do not agree. As we determined with respect to defendant's due process argument, there is no reason to depart from these courts' rulings on the issue of double enhancement. Accordingly, we find defendant's argument without merit."

Campbell later filed a petition for post-conviction relief. The petition was denied and he appealed the denial.

The Appellate Court described the claims in this way:

On appeal, Campbell presents the following issues for our review: (1) whether the trial court erred when it denied his postconviction petition which alleged that he received ineffective assistance of counsel because trial counsel failed to call an alibi witness; (2) whether the trial court erred when it denied his postconviction petition which alleged that he received ineffective assistance of counsel because trial counsel failed to object to other crimes evidence and because appellate counsel failed to raise the issue on direct appeal; and (3) whether the trial court erred when it denied his postconviction petition which alleged that the prosecutor (a) appealed to the fears and passions of the jurors, (b) accused Campbell of deception, and (c) accused defense witnesses of scripting their testimony, and trial counsel did not object to the prosecutor's comments, and appellate counsel failed to raise the issue on direct appeal.

On February 8, 2001, Campbell was charged with the first degree murder of Harold McKinney, with the attempted first degree murder of J.D. Watkins, and with aggravated discharge of a firearm. On October 2, 2001, the State answered Campbell's request for discovery and listed Stevon Lige as a potential civilian witness. On March 20, 2003, Campbell answered the State's request for discovery. On an unknown date, Campbell amended his answer to the State's request for discovery and stated that his affirmative defense of alibi was that he was with, among other people, Lige at or about the time of the alleged shooting."

The post-conviction court dealt with issues beyond those on direct appeal and so

considered other evidence not germane in the direct appeal, particularly the handling of the alibi defense.  The Appellate Court described the defense in this way:

a.  The Defendant's Case

Jcanine Griffin, Campbell's girlfriend and the mother ofhis child, testified that on December 25, 2000, at approximately 4:00p.m., she and her daughter went to Ann Robinson's, Campbell's mother's, apartment.   When she arrived, Campbell, Stevon, Glover, Jackie, Mark, Rochelle, and Robinson were at her apartment.  Campbell and Stevon left approximately 15 to 20 minutes after she arrived,  but they returned  at approximately  6:00 p.m.   She left the apartment  at 7:45 p.m., and Campbell, Stevon, Glover, Mark, Rochelle, and Robinson were still at the apartment.  Campbell was wearing an orange Coogi sweater and dark gray Coogijeans. On cross-examination, Griffin testified that she saw Campbell again at 9:30 p.m. on December 25, 2000.

Isaac Glover, Campbell's brother, testified that on December  25, 2000, at 7:00p.m., he, Campbell, Stevon, Robinson, Rochelle, Mark, Mark's three children, Griffin, and Griffin's daughter were at Robinson's apartment.  At .some point, Griffin left the apartment.  Campbell and Stevon left approximately 20 or 30 minutes after Griffin left. Campbell was wearing an orange Coogi sweater, gray Coogi pants, and boots.

Ann Robinson, Campbell's mother, testified that she had people over at her apartment  on December 25, 2000.  At approximately 6:00p.m., she, Campbell, Stevon, Mark, Griffin, and others were at the apartment.  Griffin left the apartment  between 7:20 and 7:40p.m., and Campbell  and Stevon left

approximately I 0 or 15 minutes later. Campbell was wearing an orange Coogi sweater.

b. The State's Rebuttal

In rebuttal, the State recalled Detective Stover. He testified that on January 4, 2001, he brought Campbell into an interview room at the police station and read him his <u>Miranda</u> rigbts. Campbell said he understood his rights and agreed to speak with the detective. Campbell told Detective Stover that he was drinking at his friend's house with Stevon Lige most of the day and night on December 25, 2000.

The next day, January 5, 2001, Detective Stover testified that he brought Campbell into an interview room at the police station and advised him of his Miranda rights. Campbell again agreed to speak with Detective Stover and told him that he was at his friend's house most of the day, that he left sometime in the evening, that he returned to his friend's house, that he recalled going to the vicinity of 115th and Wentworth in the evening hours, that he could not recall why he was at that location, but that he did not shoot anyone. According to Detective Stover, Campbell did not mention being at his mother's house on December 25, 2000.

…………………………

To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defendant. <u>People v. Deleon,</u> 227 lll. 2d 322, 337-38 (2008), citing Strickland v. Washington, 466 U.S. 668, 687; 80 L. Ed. 2d

674, 693; 104 S. Ct. 2052, 2064 (1984). The defendant must demonstrate that "counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' ".... The failure to satisfy either prong of the <u>Strickland</u> test precludes a finding of ineffective assistance of counsel....The same test applies to claims of ineffective assistance of appellate counsel. Therefore, if the underlying claim has no merit, the defendant has not been prejudiced and his claim fails. [some citations deleted]

### A. Defense Counsel's Failure to Call an Alibi Witness

We find that in Campbell's amended answer to the State's request for discovery, Campbell stated that his affirmative defense of alibi was that he was with Ann Robinson, Stevon Lige, Jeanine Griffin, Isaac Glover, and Gerald Gardner at or about the time of the alleged shooting. We further find that three witnesses testified about Campbell's whereabouts on the night of the shooting. First, Griffin testified that she and Campbell were at Robinson's apartment from 4:00p.m. until she left at 7:45p.m., and that she saw Campbell again at 9:30p.m. Second, Glover testified that he was with Campbell at Robinson's apartment at 7:00p.m., that Griffin left at some point that evening, and that Campbell and Stevon left approximately 20 to 30 minutes after Griffin left. Finally, Robinson testified that Griffin left her apartment between 7:20 and 7:40p.m., and that Campbell and Stevon left approximately 10 or 15 minutes later.

We note that Detective Stover testified that Campbell gave two statements

to the police. In Campbell's first statement, he stated that he was drinking at his friend's house with Lige most of the day and night on December 25, 2000. In Campbell's second statement, he said that he was at his friend's house most of the day, that he left sometime in the evening, that he returned to his friend's house, that he recalled going to the vicinity of I 15th and Wentworth in the evening hours, that he could not recall why he was at that location, but he did not shoot anyone. Finally, we note that Campbell did not mention to Detective Stover that he was at Robinson's apartment on the day of the shooting.

Campbell alleged in his postconviction petition that trial counsel was ineffective for failing to call Lige as an alibi witness. Campbell appended Lige's affidavit to his motion to supplement his postconviction petition. Lige averred in his affidavit that he was with Campbell on the night of the shooting from 12:30 p.m. until 11:00 p.m.

Defense counsel's decision to call a particular witness is a matter of trial strategy and generally will not support a claim of ineffective assistance of counsel. People v. Perry, 224 lll. 2d312, 345 (2007), citing People v. Patterson, 217 Ill. 2d 407,442 (2005). Here, defense counsel was aware that Lige was a potential alibi witness because he filed an amended answer to the State's request for discovery and indicated that Campbell's affirmative defense of alibi was that he was with Lige at the time of the shooting. Furthermore, defense counsel called Griffin, Glover, and Robinson as witnesses and attempted to establish that Campbell was with a number of people around the time of the shooting, including Lige. Detective Stover's testimony placed Campbell and his alibi witness at the

scene of the murder: the detective testified that Campbell, in one of his statements, stated that he was with Lige on the day of the shooting, but Campbell also stated that he recalled going to the vicinity of the shooting that evening. Defense counsel's amended answer to the State's discovery clearly established that counsel was aware of Lige as an alibi witness, but as part of his trial strategy, he chose not call Lige. If Lige had been called as an alibi witness, he may have given testimony that damaged the defense. We find that defense counsel did not violate Campbell's constitutional rights by employing a trial strategy that culminated in counsel electing not to call Lige as an alibi witness. Accordingly, we find that the trial court did not err in dismissing Campbell's postconviction petition because defense counsel's decision not to call Lige as an alibi witness was trial strategy.

## B. Other Crimes Evidence

Next, Campbell contends that the trial court erred when it dismissed his postconviction petition because the petition stated the gist of a constitutional claim involving other crimes evidence. Specifically, Campbell contends that his petition sufficiently alleged that he received ineffective assistance of counsel because trial counsel (1) failed to object to the other crimes evidence; (2) elicited testimony concerning his criminal history; and (3) failed to offer limiting instruction 3.14 concerning other crimes evidence. Campbell also contends that appellate counsel was ineffective for failing to raise these issues on direct appeal.

To the extent that Campbell contends that trial counsel was ineffective, we find that this issue could have been raised on direct appeal. As indicated above,

any constitutional claims that could have but were not raised on direct appear are procedurally defaulted. Harris, 224 Ill.2d at 124. Following Harris, Campbell's claim that trial counsel was ineffective for failing to object to other crimes evidence, elicited testimony concerning his criminal history, and failed to offer limiting instruction 3.14 is procedurally defaulted. Harris, 224lll. 2d at 124. However, because Campbell could not have raised the issue of appellate counsel's ineffectiveness on direct appeal, we must address that issue. Harris, 224 lll. 2d at 124.

First, Campbell argues in his brief on appeal that appellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing to object to Detective Stover's testimony that he generated Campbell's photo after running the nickname Bugsby through the Chicago police computer system. As an· initial matter, we note that Detective Stover, in explaining how he generated the picture, did not state that the computer system included persons previously convicted of other crimes. Therefore, because Detective Stover did not testify that the photo was a mug shot that was generated as a result of Campbell's participation in other crimes, his testimony was relevant . and admissible because it explained how the defendant was identified by eyewitnesses as the man who shot McKinney. See People v. P.W., 231 Ill. 2d 241,256 (2008) (noting that all evidence must be relevant to be admissible and evidence is relevant if it tends to prove a fact in controversy or render a matter in issue more or less probable), citing In re Kenneth J., 352 lll. App. 3d 967, 980 (2004).

However, even if the jury could have inferred that the Chicago police

computer system contained mug shots suggesting Campbell's involvement in an unrelated offense, we still find that if there was an error, it was harmless. In People v. Arman, the lllinois Supreme Court stated that the erroneous admission at trial of mug shot evidence suggesting the defendant's involvement in unrelated offenses does not automatically warrant reversal. People v. Arman, 131 lll. 2d 115, 124 (1989)… Specifically, the Annan court held that "[w]hen the competent evidence in the record establishes the defendant's guilt beyond a reasonable doubt and it can be concluded that retrial without the erroneous admission of the challenged evidence would produce no different result, the conviction may be affirmed." Arman, 131 Ill. 2d at 124, citing wa1mack, 83 ill. 2d at 128-29 and People v. Tranowski, 20 ill. 2d 11, 17 (1960).

In the instant case, the evidence presented to the jury established Campbell's guilt beyond a reasonable doubt. Watkins and Mabane explained that they saw Campbell walk down the street with a gun, approach their vehicle, and shoot McKinney. Furthermore, Watkins testified that after he exited from the vehicle to check on McKinney, Campbell shot at him two times. In light of Campbell's conviction, the jury clearly found Watkins and Mabane's testimony credible. See People v. Naylor, 229 Ill. 2d 584,614 (2008), citingPeop1e v. Evans, 209lll. 2d 194, 211 (2004) (the trier of fact is responsible for assessing the witnesses' credibility, detennining the appropriate weight of the testimony, and resolving any conflicts in evidence). Because two eye witnesses identified Campbell as the shooter, we find that the evidence in the record established Campbell's guilt beyond a reasonable doubt and that retrial without Detective

Stover's testimony would not produce a different result. Arman, 131 Ill. 2d at 124, Accordingly, we hold that appellate counsel was not deficient and that Campbell was not prejudiced by appellate counsel's decision not to argue in his direct appeal that trial counsel was ineffective for failing to object to Detective Stover's testimony regarding the method in which he obtained the computer generated photo of Campbell that was used in the photo array.

Next, Campbell argues that appellate counsel was ineffective for failing to argue that trial counsel was ineffective for eliciting testimony concerning Campbell's criminal history. We find that during cross-examination by defense counsel, Detective Stover testified that the photograph of Campbell used in the photo array was taken in May 1998 when Campbell was arrested for misdemeanor trespass.

We find that even if defense counsel erroneously elicited mug shot evidence from Detective Stover, admitting the evidence does not warrant reversal As indicated above in <u>Arman</u>, the Illinois Supreme Court held that such an error does not warrant reversal"(w]hen the competent evidence in the record establishes the defendant's guilt beyond a reasonable doubt and it can be concluded that retrial without the erroneous admission of the challenged evidence would produce no different result, the conviction may be affirmed." Arman, 131 TIL 2d at 124, citing <u>Warmack,</u> 83 lll. 2d at 128-29 and Trailowski, 20 lll. 2d at 17. For the reasons stated above, we find that Campbell's guilt was proven beyond a reasonable doubt by eyewitness testimony and that a retrial without Detective Stover's testimony would not produce a different result. Accordingly, we hold that

appellate counsel was not deficient and Campbell was not prejudiced when his appellate counsel elected not to argue in his direct appeal that trial counsel was ineffective for eliciting the mug shot evidence.

Finally, Campbell contends that appellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing to request limiting instruction 3.14, which instructs the jury to consider the other crimes evidence only on the issues of defendant's intent, motive, or absence of mistake. lllinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000). The Committee Notes for Instruction 3.14 provide that [if] the trial court concludes that none of the specific alternatives provided in the instruction, such as intent, motive or absence of mistake, fit the facts of the case before it, the trial court should include in the instruction an explanation that fits the. evidence. Illinois Pattern Jury Instructions, Criminal, Committee Notes, No. 3.14 (4th ed. 2000). We find that defense counsel was not ineffective for employing a trial strategy that put the mug shot evidence regarding Campbell's prior arrest in front of the jury, and reversal is not warranted given the overwhelming evidence of Campbell's guilt. The mug shot evidence was not elicited to establish the defendant's intent, motive, or absence of mistake, which was required for the court to give limiting instruction 3.14 (lllinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000)), but was elicited to explain how Campbell was identified as the person who shot McKinney. Accordingly, we find that appellate counsel's performance was not deficient and that Campbell was not prejudiced by appellate counsel's decision not to argue in his direct appeal that trial counsel was

ineffective for failing to request limiting instruction 3.14. Deleon, 227 Ill. 2d at 337-38, citing <u>Strickland</u>, 466 U.S. at 687; 80 L. Ed. 2d .at 693; 104 S. Ct. at 2064.

### C. The Prosecutor's Closing Remarks

Next, Campbell contends that the trial court erred in dismissing his postconviction petition where the petition set forth facts that could be corroborated and were objective in nature regarding the prosecutor's misconduct during closing arguments. Delton, 227lll. 2d at 254-55, citing Collins, 202lll. 2d at 66. Specifically, Campbell contends that his petition sufficiently alleged (1) that the prosecutor was guilty of misconduct for (a) appealing to the fears and passions of the jurors, (b) accusing Campbell of deception, and (c) accusing the defense witnesses· of scripting their testimony; (2) that trial counsel was ineffective for failing to object to the prosecutor's comments; and (3) that appellate counsel was ineffective for failing to raise these issues on direct appeal.

To the extent that Campbell contends that the prosecutor committed misconduct and that trial counsel was ineffective for failing to object to the prosecutor's arguments, we find that these issues could have been raised on direct appeal. As indicated above, constitutional claims that could have been but were not raised on direct appeal are procedurally defaulted. <u>Harris,</u> 224 ill. 2d at 124. Therefore, Campbell's claim that the prosecutor committed misconduct and that trial counsel was ineffective for failing to object to the prosecutor's comments is procedurally defaulted. <u>Harris,</u> 224 TIL 2d at 124. However, because Campbell could not have raised the issue of appellate counsel's ineffectiveness on direct

appeal, we must address that issue.

First, in order to determine if appellate counsel was ineffective for failing to complain about the prosecutor's arguments on direct appeal, we must determine if the prosecutor's comments during the closing arguments constitute reversible error. "Generally, prosecutors have wide latitude in the content of their closing arguments." People v. Evans, 209 Til. 2d 194,225 (2004), citing People v. Hall, 194 Ill. 2d 305, 346 (2000); People v. Macri, 185 111. 2d 1, 48 (1998).   A prosecutor's statements must be considered in context of the closing argument as a whole and the prosecutor may properly comment upon the defense counsel's characterization of the evidence in the case. [In the context] of rebuttal arguments, the prosecutor may respond to defense counsel's comments that invited a response…. A reviewing court will only find reversible error " 'if a defendant can identify remarks of the prosecutor that were both improper and so prejudicial that "real justice [was] denied or that the verdict of the jury may have resulted from the error.' " Evans, 209 Ill.. 2d at 225.

We find that the prosecutor made the following comments during his rebuttal argument: "Let me explain something about identification that was not explained to you by defense. ***And when you are placed in a situation where you have a gun in your face and you have a guy walking around your car and he's staring at you and you bet you are staring at him your mind is recognizing,-you [are] absorbing the image and it becomes burned in your mind. ***  And yet 3 years later because of what this man did, that recognition stayed with them. ***  You think about your common experiences and the traumatic things that

have happened to you and you think about your ability to recognize." We find that the prosecutor's comments were not appealing to the fears and passions of the jury. The prosecutor was responding to defense counsel's argument that Watkins and Mabane were "mistaken" when they identified Campbell as the shooter, and the prosecutor explained  why Watkins and Mabane's memories were intact. Therefore, we find that the prosecutor was responding to defense counsel's comments.

We also find that the prosecutor made the following comments during his rebuttal argument: "There is truth here and all of you together with your common sense experiences can get to it.  It's wrapped up in a box of deception presented by the defendant and it's wrapped in paper of confusion. You have to unwrap it. You have to take the truth out of the box and throw the deception away.  Again, taken in context, the prosecutor was responding to defense counsel's argument that the State's witnesses were mistaken, that his alibi witnesses were telling the truth, and that Campbell's ability to be at the scene of the shooting "defie[d] common sense."  Once again the prosecutor was responding to defense counsel's comments. Evans, 209 Ill. 2d at 225.

Finally, we find that the prosecutor made the following comments during his rebuttal argument: "[The alibi witne8ses] were remarkable in that they were so consistent.***  How do you know that what they told you on that stand is a lie? You know because your common sense tells you that if it were true that this defendant was with his family on Christmas day, they would have gqne to the police immediately. You know why they didn't do that? Because he wasn't there.

It took 3 years for them to craft the story, putting him somewhere else. *** The alibi is a fraud. *** Amazingly the alibi witnesses were never confused about a thing, had it all scripted out." We find that, taken in context, the prosecutor was responding to defense counsel's argument that the alibi witnesses consistently testified that Campbell was with them on the evening of the shooting.

Furthermore, even if the prosecutor's comments were improper, we find that Campbell was not entitled to a reversal of his convictions and sentences. Before the attorneys gave their closing arguments, the trial court gave the jury a limiting instruction that closing arguments were not evidence and that any statement or argument made by the attorneys not based on evidence should be disregarded. Jurors are presumed to follow the court's instructions. People v. Taylor, 166 lll. 2d 414, 438 (1995). Additionally, a prosecutor's comments will only result in reversible error if the remarks were so prejudicial that real justice was denied or the verdict of the jury may have resulted from the error.

In the instant case, as indicated above, the evidence against Campbell was overwhelming because Mabane and Watkins identified Campbell as the man who shot McKinney in a photo array, in a line-up, and at trial. Watkins also testified that Campbell shot at him twice. Therefore, we find that there was no reversible error because the prosecutor's remarks were not so prejudicial that real justice was denied or that the verdict may have resulted from the error. Evans, 209 lll. 2d at 225, quoting Jones, 156 lll. 2d at 247-48, quoting Yates, 98 Ill. 2d at 533.

In conclusion, we find that the prosecutor's comments were not improper and do not constitute reversible error. See generally Evans, 209 Ill.

2d at 225.   Because  the prosecutor's comments were not improper, we find that

defense counsel was not ineffective for failing to object to the prosecutor's

comments and that appellate counsel was riot ineffective for electing not to raise

the issue in Campbeil's direct appeal.   Accordingly, we find that the trial court

properly dismissed Campbell's postconviction  petition.."


## THE HABEAS CORPUS PETITION AND ITS CLAIMS

A.  Bars to Petitioner's Claims

Many of the specified grounds for relief are barred for a variety of reasons.  The

objection that the sentence enhancement for personally firing the pistol inflicting the fatal wound

on McKinney violates the "proportional penalties clause of the U.S. Constitution" was not raised

on direct appeal. There is no such clause in the Constitution.  Illinois' Constitution does contain

such a clause and there is a state law claim  made on direct appeal.  The Appellate Court found

the firearm enhancement was properly applied and that its application did not violate the state

constitution.  A federal court on habeas corpus is bound by the state application of state law.

On this direct appeal in the Appellate Court, Campbell did not raise his later claim that

the sentencing enhancement constituted double jeopardy. It was not clearly presented to the

Appellate Court. Petitioner seems to concede this by stating, in effect, that the double jeopardy

claim was implicit in his pattern of alleged facts.  Implicit claims do not preserve issues for

federal review.  In any event, petitioner does not tell us why this sentencing enhancement

violates the double jeopardy clause when the jury which tried him specifically found, by its

verdict, that the special circumstance required the mandatory enhancement.

Next, there is a raft of issues never presented to the Appellate Court on the second appeal

over his state court post-conviction proceeding.  Some were presented in the circuit court and

came on petitions for leave to appeal after the Appellate Court had affirmed the denial of post-conviction relief. The law requires habeas corpus petitioners to raise their claims throughout one complete round of state proceedings—circuit court petition, appellate court review, supreme court leave to appeal.

This was not achieved with respect to trial counsel ineffectiveness in failing to call alibi witnesses Rufus, Blackman and Williams, in failing to introduce petitioner's cell phone records, in failing to move to suppress petitioner's statement to police and the related failure of appellate counsel to challenge the effectiveness of trial counsel.

This was not achieved with respect to appellate counsel's failure to argue that the prosecution violated state law rules of discovery. Nor was it done with respect to the claim that trial counsel failed to object to the prosecution's alleged comments on petitioner's failure to testify which act of ineffectiveness, appellate counsel failed to raise on appeal. And so too the decision to move to suppress identification evidence which was not challenged by appellate counsel. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845 (1999).

Next, some claims are lost because they were not presented as Federal claims, the sentence enhancement issues are one example and the other is the evidence of "gang" involvement or culture. I don't fault petitioner for not raising them because neither seems to have a federal law basis.

Still another barrier to habeas corpus relief is the state law rule that prohibits the use of state post-conviction procedures to raise issues that could have been raised on appeal but were not. This is precisely what the Appellate Court told petitioner when he appealed the denial of post-conviction relief. By not raising the failure of trial counsel to object to closing argument and to properly examine police officers concerning a photo array on direct appeal, these issues

were procedurally forfeit. See *Szabo v. Wells,* 313 F.3d 392, 395-97 (7th Cir. 2002). A final barrier to the claim that trial counsel should have called Rufus and Blackman as defense witnesses is the state requirement that such claims must be accompanied by an affidavit from the uncalled witnesses to establish a factual basis for the premise that these witnesses would be useful to the defense. For this reason the post-conviction court rejected the claim.

There is, finally, no ground on which to excuse defaults on the premise that Campbell is actually innocent. *See Murray v. Carrier*, 477 U.S. 478, 496 (1986). If precisely the same prosecution evidence were offered again and Campbell and every one of his claimed alibi witnesses testified, a reasonable jury could still convict him. There is no DNA, no videotape and no claim that he was many miles away.

There do remain grounds for release that are not procedurally defaulted or barred in any other way and I consider them next.

B. The Available Claims

The grounds that Campbell can raise here were, in my view, reasonably rejected by the state courts.

It is difficult to see how the decision not to call Stevon Lige (of whom it is clear that defense counsel were aware) is outside the range of reasonable judgment calls. There were a several witnesses called to provide an alibi and these witnesses' version of the alibi was not consistent with Campbell's own version(s) given to police. In the context of this case, it is enough to offer fewer rather than more alibi witnesses. It reduces the risk of inconsistent testimony. It is noteworthy that Campbell claims even more witnesses to support his alibi but offers no affidavits from them.

The Appellate Court is right to conclude that defense counsel did consider Lige's value

as a witness; they checked on his parole and electronic monitoring data. Lige's affidavit itself is less than a definitive declaration of Campbell's innocence. The affidavit does not rule out Campbell's presence at the crime scene which makes Lige something other than an alibi witness unless his testimony deviates from his affidavit. Taking his affidavit as an offer of proof, it is an offer, that in itself, contradicts the testimony of the alibi witnesses who did take the stand. Even if the failure to call Lige was a mistake in judgment; it is a decision that falls well within the range of reasonable competent representation.

The attack on defense counsel for their conduct with respect to evidence that Detective Stover found a photo of Campbell in police files in connection with a misdemeanor trespass arrest is too weak to succeed. In a case where a defendant is charged with murder of one man and attempt murder of another, it is unreasonable to conclude that a criminal history consisting of one arrest for a misdemeanor trespass harms the defendant's case. Reasonable defense counsel might regard it as a boon in a case when there is some evidence of gang involvement and all the record shows is an arrest for a minor offense. The evidence was found admissible under state law and there is no error of constitutional dimension in admitting it, let alone prejudice to Campbell.

The prosecutor's closing argument was fair comment on the evidence and precisely the kind of argument that one hears often enough in both federal and state trial courts. Considering the strong evidence of guilt that the prosecutors had offered, it is appropriate for them to suggest to the jury that the defense evidence was false and scripted. The defense made similar insulting comments about the prosecution evidence.

A reasonable defense counsel is permitted to conclude that it is best not to object and risk overruling (a likely result here). Unsuccessful objections may lead jurors to infer that the

making of an objection is a signal that defense counsel regard the argument or evidence as damaging to defense cause.

The state court resolution of the claims before it is reasonable. There is no ground for invoking those claims in a petition for a writ of habeas corpus in this court.

As a whole, the petition reflects a fairly common view of petitioners whose trials resulted in a conviction of very serious crimes and the imposition of long sentences. It is understandable that such a devastating outcome would lead a convict to believe that if his trial could be redone he would do better the second time around. Frequently this belief is unjustified by any fair assessment of the decisions of defense counsel or the rulings of prior judges. The belief arises from the simple hope that doing the trial over again would change the result. The law is not sympathetic to these claims for "do overs".

I describe one sample of petitioner's thinking that displays his unfounded assessment of what his lawyers should have done and how their efforts would have made a difference. I select a claim that has not been properly preserved for federal review. I do this so that it is clear that the purpose of the following passage is to present an exemplary sample of Campbell's thought process.

Campbell thinks his lawyers should have sought to suppress his statements to Stover on the grounds that they were involuntary and there was no proper Miranda waiver. He believes that "there's a good probability that the motion to suppress would have been successful." Part of this is based on the premise that the prosecution needed "strong proof of waiver [of Miranda rights]" This is not the law, proof of voluntariness and waiver is to be shown by a preponderance of the evidence as the Supreme Court held in *Lego v. Twomey*, 404 U.S. 477, 489 (1972). The absence of a signature on a waiver form does not invalidate a waiver. It is, of

course, possible that a motion to suppress might have succeeded but to claim a "good probability" that it would have done so is wrong.

There are reasons that this is so.

Motions which seek to suppress statements which are exculpatory (or, at least, are not inculpating on their face) are very rare. None of these statements literally incriminated Campbell, he did not admit shooting anyone. The prosecution did not even offer the statements in its case in chief. The idea that an arrestee would be "compelled" to make statements that do not admit guilt or corroborate the evidence against him is one that would rarely be accepted, if at all. There was no "good probability" of success on a suppression motion and competent defense counsel would likely not make such a motion.

Campbell says that Stover lied but Campbell would have to take the witness stand himself to provide evidence of this. Campbell did not take the witness stand and this is a decision that was his, not his lawyers, to make.[1] Campbell has not preserved in his papers a claim that the decision not to testify in surrebuttal was a result of the ineffective assistance of counsel. The record shows he did discuss the decision not to testify with his lawyers. If he was advised not to testify, he does not tell us what that incompetent advice might have been. Even if he had testified, the probability that he would be believed truthful in contrast to Stover is not high. He faces here the same problem of claiming that Stover lied about the voluntariness of Campbell's statement. There is no indication that Stover could anticipate any particular alibi defense and construct a clever lie to damage a defense of which Stover could not yet be aware. If Stover were the liar that Campbell says he is, then why did not Stover testify that Campbell

---

[1] Campbell says his lawyer decided whether to put Campbell on the stand and did not allow him to testify. Yet the record shows this colloquy:
    The Court: The defendant has decided not to testify in surrebuttal, is that correct?
    Mr. Campbell: Yes.
    The Court: You discussed that with your lawyer?
    Mr. Campbell: Yes.

confessed to murder. In any event, the instruction allowed the jury to disbelieve Stover even if Campbell did not deny the statements

Campbell also complains that state discovery rules were violated because he was not told that the prosecution would call Stover to testify about what Campbell said to him. The defense was, it appears, truthfully told that Campbell's statement would not be brought out in its case. The prosecution waited until the defense offered its alibi and then chose to offer its evidence of Campbell's statement to rebut his alibi witnesses. There is no showing that the prosecutors knew exactly what Campbell's alibi witnesses would swear to but even if they did, they have the right to reserve their decision to call Stover in rebuttal until they can evaluate the effectiveness of Campbell's witnesses.

Under state discovery rules the trial judge had the discretion to allow Stover's testimony even if it were a surprise, the trial judge did so but if he was wrong it was an ordinary error in applying state law. There is nothing in the federal constitution that requires that the States provide discovery or give advance notice of rebuttal witnesses. A judge could well have decided to bar Stover's testimony on the grounds that defense should have been told explicitly that the substance of Campbell's statement might be offered in rebuttal but he had discretion to rule as he did and, if this was error under state law, it was for the state courts, not a federal court, to decide whether this was proper.

This is not a case where the existence of the witness and the testimony he would give about Campbell's statement was undisclosed. It is clear that defendant and his counsel had the police reports and knew their contents.

C. Certificate of Appealability

I have considered whether any of these preserved claims and my disposition of them should merit a certificate of appealability. I think none of them do on this record. The one

possibility in the group is the state court's resolution of the claim that defense counsel should have called Lige as a witness. Given the indefinite aspects of Lige's affidavit, however, I cannot find that reasonable jurists would find it debatable whether the claim is meritorious, standing alone, or sufficiently meritorious to justify a hearing on its merits. *See Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); 28 U.S.C. § 2253(c)(2). I deny issuance of a certificate of appealability.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied.

ENTER:

James B. Zagel
United States District Judge

DATE: January 24, 2013